UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

ALEXANDRA NEDELTCHEVA, on
her own behalf and on behalf of all other
similarly situated crewmembers working
aboard CELEBRITY cruise vessels

      Plaintiffs,

v.                                                                    **CLASS ACTION**

CELEBRITY CRUISES INC.,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, ALEXANDRA NEDELTCHEVA, on her own behalf and on behalf of all other similarly situated crewmembers working aboard CELEBRITY cruise vessels (hereinafter collectively referred to as "Plaintiffs"), hereby sue Defendant, CELEBRITY CRUISES INC. (hereinafter "CELEBRITY"), and for good cause allege:

## JURISDICTION AND PARTIES

1.      Plaintiff, ALEXANDRA NEDELTCHEVA, is a citizen of Bulgaria.

2.      Defendant, CELEBRITY CRUISES INC., is a foreign entity which conducts its business from its principal place of business in Miami, Florida.

3.      The matter in controversy exceeds the required jurisdictional amount, exclusive of interest and costs, and is a class action brought under this Honorable Court's jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the event that class status is not certified, then this matter is brought under the admiralty and maritime jurisdiction of this Honorable Court.

4.      Defendant, CELEBRITY, at all times material, personally or through an agent:

      a.   Operated, conducted, engaged in or carried out a business venture in this state and/or county and/or had an office or agency in this state and/or county;

      b.   Was engaged in substantial business activity within this state;

      c.   Operated vessels in the waters of this state;

      d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193; and/or

      e.   The acts of Defendant set out in this Complaint occurred in whole or in part in this county and/or state.

5.      Defendant is subject to the jurisdiction of the Courts of this state.

6.      The causes of action asserted in this Complaint arise under U.S. General Maritime Law and/or the Jones Act, 46 U.S.C. § 30104.

7.      At all times material hereto, Defendant owned, operated, managed, maintained and/or controlled the following subject cruise vessels: *Celebrity Apex*, *Celebrity Edge*, *Celebrity Eclipse*, *Celebrity Equinox*, *Celebrity Reflection*, *Celebrity Silhouette*, *Celebrity Solstice*, *Celebrity Constellation*, *Celebrity Infinity*, *Celebrity Millennium*, *Celebrity Summit*, *Celebrity Flora*, *Celebrity Xpedition*, and *Celebrity Xploration* (hereinafter the "vessels").

8.      At all times material hereto, Defendant operated the vessels in navigable waters.

9.      At all times material hereto, the *Celebrity Apex* was docked at the St. Nazaire shipyard in France, but was at all times material operational as a vessel and capable of navigation.

10.     At all times material hereto, an employer-employee relationship existed between Defendant and Plaintiffs, as Defendant controlled Plaintiffs' work aboard the vessels.

11.     At all times material hereto, Plaintiffs were "seamen" aboard the respective vessels to which they were assigned by Defendant to work, as the term "seaman" is defined under U.S. General Maritime Law and/or the Jones Act, 46 U.S.C. § 30104.

12.     "Seamen from the start were wards of admiralty." *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 355 (1971) (*citing Robertson* v. *Baldwin*, 165 U.S. 275, 287 (1897)). In 1823, Justice Story declared: "Every Court should watch with jealousy an encroachment upon the rights of a seaman, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But Courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty." *Harden v. Gordon*, 11 Fed. Cas. 480 (No. 6047) (C.C. Me 1823). "From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seafarer." *See Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 727 (1943). The *Aguilar* Court further held: "the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working that accompany most land occupations." *Id*. at 728.

13.     In *Chandris, Inc. v. Latsis*, the U.S. Supreme Court reaffirmed the longstanding principle that seafarers are wards of Admiralty Courts, given the "feature of the maritime law that compensate[es] or offset[s] the special hazards and disadvantages to which they who go down to sea in ships are subjected." 515 U.S. 347, 355 (1995).  The Fifth Circuit Court of Appeals explained the rationale for affording seafarers special protections in *Castillo v. Spiliada Maritime Corp.,*: "[Seafarers] enjoy this status because they occupy a unique position. **A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality in bargaining position between large ship-owners and unsophisticated seafarer**. Shipowners generally control the availability and terms of employment." 937 F.2d 240,

243 (5th Cir. 1991) (emphasis added).

14.     Accordingly, the Admiralty Courts have a rich tradition of protecting seafarers, which flows from the uniquely abhorrent conditions seafarers face at sea.  And it is not just the Courts which recognize the need to protect seafarers, as "[t]he policy of Congress, as evidenced by its' legislation, has been to deal with [seafarers] as a favored class." *Bainbridge v. Merchants' & Miners' Transp. Co.,* 287 U.S. 278 (1932).

15.     Plaintiffs, the Class Representative and Class Members herein, are and/or were crewmembers who worked for Defendant aboard Defendant's vessels and who contracted SARS-CoV-2 (hereinafter "COVID-19") and/or are/were at a heightened risk of exposure while working aboard Defendant's vessels and/or as a result of Defendant's careless conduct alleged herein.

## <u>GENERAL ALLEGATIONS COMMON TO ALL COUNTS</u>

16.     This Class Action lawsuit deals with Defendant, CELEBRITY's careless and continuous failure to protect its crewmembers assigned to work aboard the vessels from COVID-19 – despite CELEBRITY having prior notice pertaining to the dangerous conditions and/or explosive contagiousness associated with COVID-19 aboard its vessels from previous passengers, crewmembers and/or other invitees (e.g., independent contractors) CELEBRITY allowed aboard the vessels and/or actively granted access to same.[1]

17.     Despite having notice that COVID-19 was and/or likely was present aboard the vessels, CELEBRITY glaringly failed to follow even the most basic safety precautions after acquiring such notice, such as timely quarantining crewmembers stationed aboard the vessels, timely providing

---

[1] *See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020)  https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html;  and Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order,* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf  (hereinafter collectively referred to as the "Memorandums" or individually as a "Memorandum").

crewmembers stationed aboard the vessels masks and/or timely requiring them to observe social distancing measures aboard the vessels.

18.     Instead, in an alarming lack of urgency, CELEBRITY has allowed its crewmembers to eat in buffet settings aboard the vessels, mandated their participation in shipboard drills, and even permitted crewmembers to attend crew parties aboard the vessels. CELEBRITY's egregious failure to protect its employees has already resulted in hundreds of positive COVID-19 cases and what is more likely thousands given that there is limited testing being done on its vessels.

19.     The dangerous conditions associated with COVID-19 include its manifestations – severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock and/or multi-organ failure[2] – and/or its symptoms – fever, dry cough, and/or shortness of breath[3] – as well as the high fatality rate associated with contracting the virus.[4] The dangerous conditions associated with COVID-19 also include its extreme contagiousness. For example, a person with COVID-19 infects, on average, another 2.5 people, and COVID-19 is therefore more contagious than Ebola or Influenza.[5]

20.     As a result of its careless conduct further detailed below, CELEBRITY negligently exposed and is currently exposing thousands of its crewmembers to COVID-19. Such harm includes, but is not limited to, these crewmembers suffering from lung injuries caused by COVID-19 and/or

---

[2]   *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order*, https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.

[3] *See* Mayo Clinic, *Symptoms and Causes*, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last accessed April 6, 2020); *see also* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

[4]   *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf (identifying a 3.6% global fatality rate); Journal of the American Medical Association, *Case-Fatality Rate and Characteristics of Patients Dying in relation to COVID-19 in Italy*, https://jamanetwork.com/journals/jama/fullarticle/2763667 (identifying a 7.2% and 2.3% fatality rate in Italy and China, respectively).

[5] Popular Science, *COVID-19 Contagiousness*, https://www.popsci.com/story/health/how-diseases-spread/.

permanently reduced lung capacity, complications and/or further injury/ies caused by contracting COVID-19 in conjunction with pre-existing illness and/or medical conditions and/or death.[6]

**Background on the worldwide spread of COVID-19**

21.    Since December 2019, there has been a worldwide outbreak of COVID-19, which is now considered a pandemic. The virus originated in China, and quickly spread throughout Asia, Europe, and most recently, North America.

22.    There have been over one million confirmed cases and over seventy thousand deaths worldwide as a result of the COVID-19 pandemic.

23.    On or about February 13, 2020, the Center for Disease Control (hereinafter the "CDC") published the *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, which provided guidance for ship operators, including cruise ship operators, to help prevent, detect, and medically manage suspected COVID-19 infections aboard ships, like the vessels named herein. *See* the Memorandum cited at footnote 1.

24.    In view of the fact that Defendant, CELEBRITY, has its principal place of business in Miami, Florida, and operates numerous cruise vessels which originate from and/or stop at ports within the U.S., as early as February 13, 2020, Defendant, CELEBRITY, knew and/or should have been aware of this Memorandum, including, but not limited to, the dangerous conditions and/or explosive contagiousness associated with COVID-19, and its all but certain presence aboard Defendant's vessels at that time.

25.    This Memorandum provided cruise vessel operators, like CELEBRITY, with numerous helpful considerations to assist in detecting and preventing the spread of COVID-19 amongst its

---

[6]    *See* South China Morning Post, *Cornoavirus*, https://www.scmp.com/news/hong-kong/health-environment/article/3074988/coronavirus-some-recovered-patients-may-have; Deutsche Welle, *COVID-19*, https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671.

crewmembers, passengers and its vessels at large, some of which include:

- "Early detection, prevention, and control of Coronavirus Disease 2019 (COVID-19) on ships **is important** to protect the health of travelers on ships and to avoid transmission of the virus by disembarking passengers and crew members who are suspected of having COVID-19";

- "Identifying and isolating passengers and crew with possible symptoms of COVID-19 as soon as possible **is needed** to minimize transmission of this virus";

- "To reduce spread of respiratory infections including COVID-19, CDC **recommends** that ships encourage crew members and passengers to

  - Postpone travel when sick

  - Watch their health

  - Self-isolate and inform the onboard medical center immediately if they develop a fever (100.4ºF / 38ºC or higher), begin to feel feverish, or develop other signs or symptoms of sickness

  - Use respiratory, cough, and hand hygiene

    - Advise passengers and crew of the importance of covering coughs and sneezes with a tissue. Dispose used tissues immediately in a disposable container (e.g., plastic bag) or a washable trash can.

    - Remind passengers and crew members to wash their hands often with soap and water, especially after coughing or sneezing. If soap and water are not available, they can use a hand sanitizer containing 60%-95% alcohol"

- "**Deny boarding of a passenger or crew member** who is suspected to have COVID-19 infection based on signs and symptoms plus travel history in China or other known exposure at the time of embarkation";

- "Passengers and crewmembers who have had high-risk exposures to a person suspected of having COVID-19 **should be** quarantined in their cabins. All potentially exposed passengers, cruise ship medical staff, and crew members **should** self-monitor under supervision of ship medical staff or telemedicine providers until 14 days after the last possible exposure";

- "**Isolate passengers or crew onboard** who are suspected of having COVID-19 infection in a single-occupancy cabin with the door closed until symptoms are improved."

*See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

26.     Defendant, CELEBRITY, and the cruise industry at large, received an early warning of how easily COVID-19 could spread on massive ocean liners when the first cases emerged aboard the *Diamond Princess*, a vessel owned by Princess Cruise Lines ("Princess"), which is owned by Carnival Corporation, in early February 2020 in Yokohama Harbor, Japan. The outbreak began with ten confirmed COVID-19 cases, which rapidly multiplied to seven hundred confirmed cases, as a result of Princess' flawed two-week quarantine of passengers and crewmembers aboard the *Diamond Princess*.

27.     The CDC issued a statement on February 18, 2020, providing that "the rate of new reports of positives new on board [the *Diamond Princess*], especially among those without symptoms, **highlights the high burden of infection on the ship and potential for ongoing risk**."[7] Seven of the *Diamond Princess*' passengers ultimately died as a result of COVID-19 exposure aboard the vessel.

28.     The cruise industry received yet another warning of how severe COVID-19 could spread on cruise ships when the *Grand Princess*, another vessel owned by Princess, which is also owned by Carnival Corporation, had a breakout in late February 2020 off the coast of California. Princess had knowledge that at least one of its passengers from a prior voyage who disembarked the *Grand Princess* on February 21, 2020 had symptoms of COVID-19, and yet, it made the conscious decision to proceed with the subsequent voyage aboard the *Grand Princess* that began on February 21, 2020 with another three thousand passengers on an infected ship.

---

[7]     Centers for Disease Control, *Update on the* Diamond Princess *Cruise Ship in Japan*, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (emphasis added).

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

29.     Prior to boarding the February 21, 2020 voyage on the Grand Princess, passengers were simply asked to fill out a piece of paper confirming they were not sick. Not one passenger was questioned, let alone examined, in any capacity. As a result of Princess' lackadaisical approach to the safety of passengers and crew, 103 passengers eventually tested positive for COVID-19 and two people have died so far.

30.     On or about March 14, 2020, the CDC issued its first No Sail Order.[8] The No Sail Order is/was applicable to cruise ship operators, like Defendant herein, and provided science updates known to date pertaining to the explosive contagiousness associated with COVID-19 and how the virus presented dangerous conditions to passengers and crewmembers aboard cruise ships, like the vessels named herein. For example, the CDC's first No Sail Order stated the following:

- **"Like other close-contact environments, cruise ships facilitate transmission of COVID-19**."

- "There are several features of cruise ships that increase the risk of COVID-19 transmission."

- "A hallmark of cruise travel is the number and variety of person-to-person contacts an individual passenger may have daily."

- **"The dynamics of passenger-to-passenger, passenger-to-crew, crew-to-passenger, and crew-to-crew intermingling in a semi-closed setting are particularly conducive to SARS-CoV-2 spread, resulting in high transmission rates**."

- **"Cruises include frequent events that bring passengers and crew close together, including group and buffet dining, entertainment events, and excursions. Cruise ship cabins are small, increasing the risk of transmission between cabinmates**."

- "Close quartering is a particular concern for crew, who typically eat and sleep in small, crowded spaces."

- **"Infection among crew members may lead to transmission on sequential cruises on the same vessel because crew members may continue working and**

---

[8]    *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.

**living onboard the ship from one cruise to the next**.”

- “Crew from one ship may in turn serve onboard multiple different ships for subsequent voyages, which also has the potential to amplify transmission.”

*See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf (emphasis added).

31.    Outlined below is a timeline of events relevant to this Class Action lawsuit against CELEBRITY. This timeline supports all claims asserted herein on behalf of the entire class. More specifically, this timeline supports CELEBRITY having actual knowledge of the dangerous conditions and/or explosive contagiousness associated with COVID-19 aboard the subject vessels at the time the first Class Member (i.e., a CELEBRITY crewmember) contracted COVID-19:

a.    December 31, 2019 – The local government in Wuhan, China, confirmed with the World Health Organization (hereinafter “WHO”) that local health authorities in Wuhan were treating an influx of dozens of patients with what appeared to be novel cases of pneumonia with an unknown cause.

b.    January 5-7, 2020 – China announced that the novel pneumonia cases in Wuhan were not caused by severe acute respiratory syndrome (hereinafter “SARS”) or middle-east respiratory syndrome (hereinafter “MERS”) – but COVID-19 – which belongs to the highly-contagious family of coronaviruses, including SARS and MERS.

c.    January 11, 2020 – The Wuhan Municipal Health Commission announced the first death caused by COVID-19.

d.    January 20, 2020 – A situation report published by the WHO confirmed COVID-19 cases outside of mainland China in Thailand, Japan and South Korea, which the WHO believed to have been exported from Wuhan, China. The situation report also identified 282 positive COVID-19 diagnoses worldwide with 278 of those positive cases within China.

e.    January 21, 2020 – A man in Washington State, U.S.A., became the first person diagnosed with COVID-19 in the U.S.A.

f.    January 23, 2020 – Chinese authorities take the unprecedented measure of closing off Wuhan – a city of over 11,000,000 people – to stop the spread of COVID-19.

g.    January 30, 2020 – WHO declared COVID-19 a “global health emergency” – recognizing that COVID-19 posed a risk beyond China. The U.S. Department of

State issued a Level 4 (highest level) travel advisory as it related to U.S. citizens who planned to travel to China.

h. <u>January 31, 2020</u> – Spain announced its first confirmed COVID-19 case.

i. <u>February 2, 2020</u> – China reports that the death toll from COVID-19 in mainland China (361) exceeded the death toll in mainland China from the SARS outbreak in the early 2000s (349).

j. <u>February 5, 2020</u> – Chinese officials announced that nearly 500 people in mainland China have died as a result of COVID-19.

k. <u>February 5, 2020 (*Diamond Princess*)</u> – Passengers aboard the *Diamond Princess* near Yokohama, Japan began a two-week quarantine after nine (9) passengers and one (1) crewmember tested positive for COVID-19 while aboard the vessel.

l. <u>On or about February 13, 2020</u> – The CDC published the Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019, which provided guidance for ship operators, including cruise ship operators, to help prevent, detect, and medically manage suspected COVID-19 infections.[9]

m. <u>February 21, 2020 (*Grand Princess*)</u> – The *Grand Princess* embarks on a voyage despite its cruise operator, Princess, having knowledge that at least one of its passengers from a prior voyage who disembarked the *Grand Princess* on February 21, 2020 had symptoms of COVID-19 while aboard the vessel.

n. <u>February 19-25, 2020 (*Diamond Princess*)</u> – Following the two-week quarantine aboard the *Diamond Princess*, Japanese officials announced that of the 3,711 passengers aboard the vessel, over 700 tested positive for COVID-19 (**18.8%**) – the largest cluster of positive COVID-19 cases outside of mainland China at that time.

o. **<u>March 1, 2020 (*Celebrity Eclipse*)</u> – The *Celebrity Eclipse* debarked from Argentina for a fourteen (14) night Argentinian and Chilean cruise.**

p. **<u>March 2, 2020 (*Celebrity Apex*)</u> – Plaintiffs/crewmembers boarded the *Celebrity Apex* while it was docked in the St. Nazaire shipyard, France, to serve aboard the vessel for her maiden voyage. Approximately 1,400 of Defendant's crewmembers and many multiple independent contractors, including French nationals, also boarded the vessel at or around this same time.**

---

[9] *See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

q. **On or about March 2, 2020 (*Celebrity Eclipse*) – A passenger (or passengers) aboard the *Celebrity Eclipse* complained of flu-like symptoms consistent with a COVID-19 diagnosis.**

r. March 8, 2020 – Spain (a country which boarders France to the south) reported 589 COVID-19 cases and 17 COVID-19 related deaths.

s. March 9, 2020 (*Grand Princess*) – The Grand Princess docked in Oakland, California and its passengers were held in quarantine. Of the 3,553 passengers onboard, 21 of the 46 first round of passengers tested for COVID-19 tested positive (**45%**). Many passengers ultimately refused COVID-19 testing so that they could disembark and travel to the safety of their homes quicker.

t. March 12, 2020 – Spain reported over 3,000 COVID-19 cases and 84 COVID-19 related deaths.

u. **March 13, 2020 (*Royal Caribbean*) – Royal Caribbean, CELEBRITY's parent company, suspends all of its future cruises, including those associated with its subsidiary companies, such as CELEBRITY.**

v. **March 13, 2020 (*Celebrity Apex*) – CELEBRITY acquired reason to suspect the presence of COVID-19 aboard the *Celebrity Apex*, and thereafter marginally limits, but does not flat-out restrict, non-essential crewmember travel aboard and/or on/off the vessel.**

w. **March 14, 2020 – The CDC issued its first No Sail Order. The No Sail Order is/was applicable to cruise ship operators, like Defendant herein, and provided science updates known to date pertaining to the explosive contagiousness associated with COVID-19 and how the virus presented dangerous conditions to passengers and crewmembers aboard cruise ships, like the vessels named herein.**[10]

x. March 14, 2020 – Spain ordered a nation-wide lockdown, banning all intra-country travel except travel to procure food, medicine and travel related to essential business operations.

y. **March 15, 2020 (*Celebrity Eclipse*) – The *Celebrity Eclipse* is denied the ability to dock in Chile because of the country's concerns with passengers and crew aboard who may have COVID-19. Following this development, CELEBRITY orders all passengers aboard the ship to self-isolate; however, CELEBRITY required that all crewmembers continue cruise operations as usual and CELEBRIY did not take any specific counter-COVID-19 safety measures as it related to crewmembers.**

---

[10] *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.

z. <u>March 17, 2020</u> – France ordered a nation-wide lockdown, banning all intra-country travel except travel to procure food, medicine and travel related to essential business operations.

aa. **<u>March 17-20, 2020</u> (*Celebrity Apex*) – CELEBRTIY continued to allow independent contractors working aboard the *Celebrity Apex* to freely travel on and off the vessel – *<u>in complete disregard for the CDC's No Sail Order, France's nation-wide lockdown and/or Royal Caribbean/CELEBRITY's own infectious disease-related policies and procedures</u>*.**

bb. **<u>March 21, 2020</u> (*Celebrity Apex*) – CELEBRTIY ordered that all crewmembers aboard the *Celebrity Apex* perform mandatory crew drills. Later that same day, CELEBRITY held a crew party for all crewmembers aboard the vessel wherein crewmembers were served food while standing in large buffet lines, and later ate dinner together.**

cc. <u>March 23, 2020</u> (*Celebrity Apex*) – News spread around the *Celebrity Apex* that seven (7) crewmembers aboard the vessel had tested positive for COVID-19.

dd. **<u>On or about March 24, 2020</u> (*Celebrity Apex*) – Defendant ordered that all non-essential crewmembers aboard the *Celebrity Apex* be quarantined, e.g., those crewmembers that worked in the dining services departments were not quarantined.**

ee. **<u>On or about March 25, 2020</u> (*Celebrity Apex*) – CELEBRITY conducted large-scale testing of symptomatic crewmembers aboard the *Celebrity Apex*.**

ff. **<u>On or about March 26, 2020</u> (*Celebrity Eclipse*) – A crewmember aboard the *Celebrity Eclipse* and Class Member herein, tested positive for COVID-19 while aboard the vessel.**

gg. **<u>March 30, 2020</u> (*Celebrity Eclipse*) – The *Celebrity Eclipse* docks in San Diego, California. CELEBRITY permits passengers to disembark and go home, but CELEBRITY quarantines all crewmembers onboard.**

hh. **<u>March 30, 2020</u> (*Celebrity Apex*) – Defendant tested Plaintiff, ALEXANDRA NEDELTCHEVA, for COVID-19, and she tested positive for same while aboard the vessel**.

ii. **<u>April 6, 2020</u> (*Celebrity Apex*) – Approximately three hundred and fifty (350) crewmembers working aboard the *Celebrity Apex* test positive for COVID-19. Eight (8) crewmembers who tested positive were admitted to a local French hospital; four (4) such crewmembers <u>who displayed symptoms</u> return to the ship a few days later, the other four (4) remain in the French hospital.**

jj. <u>April 9, 2020</u> – The CDC issued its second No Sail Order.[11]

32. Based on the foregoing timeline of relevant events, CELEBRITY knew or should have known of the dangerous conditions and/or explosive contagiousness associated with COVID-19 aboard the subject vessels as early as February 13, 2020 when the CDC published its *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019* and/or as late as March 2, 2020 when a passenger(s) aboard the *Celebrity Eclipse* complained of flu-like symptoms consistent with a COVID-19 diagnosis.

## CLASS ACTION ALLEGATIONS

33. At all times material hereto, Plaintiffs, the Class Representative and Class Members herein, are and/or were crewmembers who worked for Defendant aboard Defendant's vessels and who contracted COVID-19 and/or were at a heightened risk of exposure while working aboard Defendant's vessels and/or as a result of Defendant's careless conduct alleged herein.

34. This action is brought by Plaintiff on her own behalf, and on behalf of all others similarly situated, under the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

35. The class so represented by the Plaintiff in this action, and of which Plaintiff is a member, consists of all crewmembers who worked aboard Defendant's cruise vessels who were subjected to the dangerous conditions outlined above in connection with Defendant's unreasonably dangerous and/or lackadaisical response to the COVID-19 pandemic and/or its presence aboard Defendant's vessels, as early as February 13, 2020 when the CDC published its *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019* and/or as late as March 2, 2020 when a passenger(s) aboard the *Celebrity Eclipse* complained of flu-like symptoms consistent with a COVID-19 diagnosis.

---

[11] *See* Centers for Disease Control, *April 9, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/No-Sail-Order-Cruise-Ships_Extension_4-9-20-encrypted.pdf.

LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.
WWW.LIPCON.COM

36.     This class of crewmembers contracted COVID-19 and/or suffered medical complications arising from it and/or became more susceptible and/or vulnerable to other illness and/or medical conditions, including pre-existing illness and/or medical conditions, and were injured about their bodies and/or extremities, suffered physical pain and suffering, mental anguish, reduced lung function and/or capacity, future physical and medical problems (including but not limited to reduced lung function and/or capacity) and/or the reasonable fear of developing future physical and medical problems as a result of Defendant's negligence and/or gross negligence and/or intentional conduct.

37.     The exact number of members of the class is unknown at this time given that many members are currently in voluntary or forced isolation aboard Defendant's vessels at this time; however, at this time it is estimated that there are in excess of 10,000 members. The class is so numerous that joinder at this anticipated amount of all members is impracticable. Thus, this action satisfies the requirements of Rule 23(a)(1).

38.     There are common questions of law and fact that relate to and effect the rights of each member of the class and the relief sought is common to the entire class. The same misconduct on the part of Defendant, CELEBRTIY, caused the same or similar injury to each class member.  All class members seek damages under U.S. General Maritime Law and/or the Jones Act, 46 U.S.C. § 30104.  Accordingly, this action satisfies the requirement of Rule 23(a)(2).

39.     The claims of Plaintiffs are typical of the claims of the class, in that the claims of all members of the class, including the named Plaintiff, depend upon a virtually identical showing of the acts and omissions of Defendant, CELEBRITY, giving rise to the right of Plaintiff to the relief sought herein. Defendant, CELEBRITY, was at all times material hereto engaged in the same conduct to the detriment of the entire class of Plaintiffs. Accordingly, this action satisfies the

LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.
WWW.LIPCON.COM

requirements of Rule 23(a)(3).

40.     Plaintiff is the representative party for the class, and is able to, and will, fairly and adequately protect the interests of the class. There is no conflict between Plaintiff and other members of the class with respect to this action, or with respect to the claims for relief herein. The attorneys for Plaintiff are experienced and capable in the field of maritime claims for cruise ship passenger injury, including class actions, and have successfully represented claimants in other litigation of this nearly exact nature. Three of the attorneys designated as counsel for Plaintiff, Jason R. Margulies, Michael A. Winkleman, and L. Alex Perez, will actively conduct and be responsible for Plaintiff's case herein. Accordingly, this action satisfies the requirement of Rule 23(a)(4).

41.     This action is properly maintained as a class action under Rule 23(b)(3) inasmuch as questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.  In support of the foregoing, Plaintiffs allege that common issues predominate and can be determined on a class-wide basis regarding Defendant, CELEBRITY's failure to provide Plaintiffs with a reasonably safe place to work aboard Defendant's vessels, in view of Defendant's careless and/or lackadaisical response to the COVID-19 pandemic and/or its confirmed and/or likely presence aboard Defendant's vessels while Plaintiffs worked and continue to work aboard same.

42.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because it is unlikely that individual plaintiffs would assume the burden and the cost of this complex litigation, and Plaintiff is not aware of any class members who are interested in individually controlling the prosecution of a separate action. The interests of justice

will be served by resolving the common disputes of the class members with Defendant, CELEBRITY, in a single forum, and individual actions by class members, many of whom are citizens of different states would not be cost effective. The class consists of a finite and identifiable number of individuals which will make the matter manageable as a class action.

43.     CELEBRITY and many of the Plaintiffs herein have entered into employment contracts and/or Collective Bargaining Agreement's ("CBAs"), which call for arbitration of employment-related disputes between CELEBRITY and the respective seafarers. However, no arbitration provision in any of the Plaintiffs' employment contracts and/or CBAs with CELEBRITY expressly call for arbitration of class action employment-related claims.

44.     Aggrieved parties cannot be forced to submit class action disputes to arbitration unless there is a contractual basis for concluding that the aggrieved parties agreed to do so. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684-87 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so . . . An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. . . class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.") (emphasis in original).

45.     Here, because there is no contractual provision in any written agreement between Plaintiffs and CELEBRITY to submit employment-related class action disputes to arbitration, Plaintiffs Class Action lawsuit filed in this Court is proper. *See id.*

## COUNT I – JONES ACT NEGLIGENCE

Plaintiffs re-allege, incorporate by reference, and adopt paragraphs one (1) through forty-five (45) above as though originally alleged herein.

46.    At all times material hereto, it was the duty of Defendant to provide Plaintiffs with a reasonably safe place to work.

47.    At all times material hereto, Defendant and/or its agents, servants, and/or employees acts and/or omissions caused, contributed and/or played a substantial part in bringing about Plaintiffs' injuries and/or death for reasons that include, but are not limited to, the following:

    a.  Failure to use reasonable care to provide Plaintiffs with a reasonably safe place to work aboard the subject vessels to which they were assigned;

    b.  Failure to reasonably restrict individuals' access to the vessels (including, but not limited to CELEBRITY's passengers, shoreside personnel, independent contractors, crewmembers, etc.) once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels;

    c.  Failure to reasonably examine all individuals whom Defendant permitted to board the vessels to determine whether any of them exhibited symptoms consistent with a positive COVID-19 diagnosis, including, but not limited to, determining whether any individual permitted to board the vessels exhibited symptoms of fever, cough, and/or shortness of breath;

    d.  Failure to timely enact fleetwide vessel lockdowns of all non-essential personnel once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels; e.g., on March 21, 2020, when CELEBRTIY ordered that all crewmembers aboard the *Celebrity Apex* perform crew drills aboard the vessel, and later on that day, CELEBRITY held a crew party for all crewmembers aboard the vessel wherein crewmembers were served food while standing in large buffet lines and later ate dinner together;

    e.  Failure to timely enact fleetwide vessel social distancing measures, including, but not limited to a requirement that all shipboard individuals maintain separation of at least six (6) feet;

    f.  Failure to reasonably test all individuals whom Defendant permitted to board its cruise vessels, including, but not limited to, the *Celebrity Apex* for COVID-19

and/or those with classic COVID-19 symptoms;

g.  Failure to timely quarantine those passenger and/or crewmembers whom Defendant reasonably suspected had contracted COVID-19 aboard its vessels;

h.  Failure to reasonably and/or timely identify passengers and/or crewmembers who recently traveled to COVID-19 high risk/exposure locations before permitting them to board the vessels;

i.  Failure to adequately warn crewmembers before they boarded the vessels and/or anytime during cruising aboard the vessels that a passenger(s) on a prior cruise showed symptoms and/or tested positive for COVID-19; and/or

j.  Failure to sufficiently warn crewmembers working aboard the vessels of the dangers and/or risks of COVID-19 and/or other related infectious disease, including, but not limited to, failing to inform the crewmembers of the extent of the prior COVID-19 outbreaks and/or risks and/or symptoms aboard the vessels;

k.  Failure to reasonably educate crewmembers working aboard the vessels as to the explosive contagiousness of COVID-19, including but not limited to explaining to crewmembers ways they can reduce and/or eliminate their exposure to COVID-19 aboard the vessels;

l.  Failure to adequately sanitize and/or disinfect the vessels' common areas, passengers' cabins and/or crewmembers' cabins aboard the vessels once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels;

m.  Failure to adequately sanitize and/or disinfect plates, cups, food trays, utensils, ice machines and drinking fountains aboard the vessels once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels;

n.  Failing to practice safe and sanitary food practices aboard the vessels;

o.  Failure to take adequate steps to prevent an outbreak of COVID-19 and/or virus and/or infectious disease aboard Defendant's vessels when Defendant knew or should have known that such outbreaks had occurred on prior cruise voyages aboard its other vessels;

p.  Failure to have adequate policies and procedures in place to manage and/or contain the outbreak and spread of COVID-19 and/or virus and/or infectious disease aboard the vessels;

q.  Failure to provide sanitary vessels upon which Plaintiffs were assigned to work so as to prevent outbreaks of COVID-19 and/or virus and/or infectious diseases,

including, but not limited to, Defendant's inadequate and/or ineffective cleaning/sanitary procedures and/or lack of equipment and supplies;

r.  Failure to equip the vessels and/or provide crewmembers with a sufficient amount cleaning and/or disinfectant equipment and/or personal protective equipment; and/or

s.  Failure to man the vessel with a sufficient number of competent crewmembers responsible for cleaning and/or disinfecting the ship in view of the ongoing COVID-19 pandemic.

48.   The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated aboard Defendants' vessels to contract COVID-19 and/or other virus and/or medical complications, sustain personal injuries and/or death.

49.   At all times material hereto, Defendant knew or should have known of the foregoing conditions which caused and/or resulted in Plaintiffs' injuries and/or death and did not correct them. In the alternative, the foregoing conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care should have learned of them and corrected them.

50.   As a result of Defendant's negligence, Plaintiffs contracted COVID-19, became more susceptible and/or vulnerable to other illness and/or medical conditions, including pre-existing illness and/or medical conditions, and were injured about their bodies and/or extremities. Plaintiffs also suffered physical pain and suffering, mental anguish, reduced lung function and/or capacity, future physical and medical problems (including but not limited to reduced lung function and/or capacity) and/or the reasonable fear of developing future physical and medical problems. Plaintiffs also lost enjoyment of life, and suffered physical and/or functional disability, physical and/or functional impairment. Plaintiffs were also inconvenienced in the normal pursuits and pleasures of life and suffered from feelings of economic insecurity caused by disability, disfigurement. Plaintiffs also suffered aggravation of any previously existing conditions as a result of contracting COVID-19, incurred medical expenses in the care and treatment of their injuries, suffered physical

handicap, lost wages, income lost in the past, and their working abilities and/or earning capacities have been impaired. Additionally, some Plaintiffs have or will die. The Plaintiffs that do not die immediately will experience a reduced life expectancy. Plaintiffs injuries and damages are permanent or continuing in nature, and they will suffer these losses and impairments in the future.

**WHEREFORE,** Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant and demand trial by jury.

## COUNT II – UNSEAWORTHINESS

Plaintiffs re-allege, incorporate by reference, and adopt paragraphs one (1) through forty-five (45) above as though originally alleged herein.

51.    At all times material hereto, Defendant had an absolute and non-delegable duty to maintain the vessels on which Plaintiffs served in a seaworthy condition.

52.    At all times material hereto, Defendant's vessels were unseaworthy and such unseaworthiness were a legal cause of injury and damage to the Plaintiffs by reason that include, but are not limited to, the following:

    a.   The vessels were not reasonably fit for their intended purposes;

    b.   The vessels' crew was not reasonably fit for the vessels' intended purpose;

    c.   The vessels failed to have and/or enforce means to reasonably restrict individuals' access to the vessels (including, but not limited to CELEBRITY's passengers, shoreside personnel, independent contractors, crewmembers, etc.) once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels;

    d.   The vessels failed to have and/or enforce means to reasonably examine all individuals whom Defendant permitted to board the vessels to determine whether any of them exhibited symptoms consistent with a positive COVID-19 diagnosis, including, but not limited to, determining whether any individual permitted to board the vessels exhibited symptoms of fever, cough, and/or shortness of breath;

    e.   The vessels failed to have and/or enforce means to timely enact a vessel-wide lockdowns of all non-essential personnel once CELEBRITY acquired notice of the

dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its vessels; e.g., on March 21, 2020, when CELEBRTIY ordered that all crewmembers aboard the *Celebrity Apex* perform crew drills aboard the vessel, and later on that day, CELEBRITY held a crew party for all crewmembers aboard the vessel wherein crewmembers were served food while standing in large buffet lines and later ate dinner together;

f.  The vessels failed to have and/or enforce means to timely enact vessel-wide social distancing measures, including, but not limited to a requirement that all shipboard individuals maintain separation of at least six (6) feet;

g.  The vessels failed to have and/or enforce means to timely quarantine those passenger and/or crewmembers whom Defendant reasonably suspected had contracted COVID-19;

h.  The vessels failed to have and/or enforce means to reasonably and/or timely identify passengers and/or crewmembers who recently traveled to COVID-19 high risk/exposure locations;

i.  The vessels failed to have and/or enforce means to reasonably test all individuals whom Defendant permitted to board the vessels for COVID-19 and/or those with classic COVID-19 symptoms;

j.  The vessels failed to have and/or enforce means to reasonably educate crewmembers as to the explosive contagiousness of COVID-19, including but not limited to explaining to crewmembers ways they can reduce and/or eliminate their exposure to COVID-19 aboard the vessels;

k.  The vessels failed to have and/or enforce adequate policies and procedures in place to manage and contain the outbreak and spread of COVID-19 and/or virus and/or infectious disease;

l.  The vessels were not sanitary to the extent necessary to prevent outbreaks of COVID-19 and/or virus and/or infectious diseases, including, but not limited to, their inadequate and/or ineffective cleaning/sanitary procedures and/or lack of equipment and supplies;

m.  The vessels were not equipped with a sufficient amount of cleaning and/or disinfectant equipment and/or personal protective equipment; and/or

n.  The vessels were not manned with a sufficient number of competent crewmembers responsible for cleaning and/or disinfecting the ship in view of the ongoing COVID-19 pandemic.

53.     The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated aboard Defendants' vessels to contract COVID-19 and/or other virus and/or medical complications, sustain personal injuries and/or death.

54.     At all times material hereto, Defendant knew or should have known of the foregoing conditions which caused and/or resulted in Plaintiffs' injuries and/or death and did not correct them. In the alternative, the foregoing conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care should have learned of them and corrected them.

55.     As a result of the unseaworthiness of the vessels, Plaintiffs contracted COVID-19, became more susceptible and/or vulnerable to other illness and/or medical conditions, including pre-existing illness and/or medical conditions, and were injured about their bodies and/or extremities. Plaintiffs also suffered physical pain and suffering, mental anguish, reduced lung function and/or capacity, future physical and medical problems (including but not limited to reduced lung function and/or capacity) and/or the reasonable fear of developing future physical and medical problems. Plaintiffs also lost enjoyment of life, and suffered physical and/or functional disability, physical and/or functional impairment. Plaintiffs were also inconvenienced in the normal pursuits and pleasures of life and suffered from feelings of economic insecurity caused by disability, disfigurement. Plaintiffs also suffered aggravation of any previously existing conditions as a result of contracting COVID-19, incurred medical expenses in the care and treatment of their injuries, suffered physical handicap, lost wages, income lost in the past, and their working abilities and/or earning capacities have been impaired. Additionally, some Plaintiffs have or will die. The Plaintiffs that do not die immediately will experience a reduced life expectancy. Plaintiffs injuries and damages are permanent or continuing in nature, and they will suffer these losses and impairments in the future.

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

**WHEREFORE,** Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant and demand trial by jury.

### COUNT III – FAILURE TO PROVIDE MAINTENANCE AND CURE

Plaintiffs re-allege, incorporate by reference, and adopts paragraph one (1) through forty-five (45) above as though originally alleged herein.

56.    On or about March 2, 2020, Plaintiffs were injured while in the service of Defendant's vessels as crewmembers.

57.    Under the General Maritime Law, Plaintiffs, as seamen, are entitled to recover maintenance and cure from Defendant, their employer, until they are declared to have achieved Maximum Medical Improvement (MMI) and/or Maximum Medical Cure (MMC). Maintenance and cure include unearned wages (regular wages, overtime, vacation pay and tips), which the seamen reasonably anticipated to earn through the end of the contract or voyage, whichever is longer. In addition, an MMI declaration must be unequivocal, and if not, any doubts or controversy regarding whether the seaman is at MMI must be resolved in the seaman's favor.

58.    To date, no medical professional has declared that any Plaintiff has achieved MMI, and all Plaintiffs are therefore entitled to receive from Defendant medical treatment from physicians of their choice and daily maintenance payments until they a medical professional declares each of them, respectively, at MMI.

59.    At all times material hereto, Defendant willfully and/or callously delayed, failed and/or refused to provide Plaintiffs with their full entitlement to maintenance and cure, and/or Defendant willfully and/or callously delayed, failed and/or refused to provide the Plaintiffs the level of medical treatment and/or maintenance they require to recover from COVID-19 and/or reasonably support themselves as they convalesce, such that Plaintiffs have become obligated seek the

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

undersigned's legal services and pay the undersigned a reasonable attorney's fee.

60.     At all times material hereto, Defendant's failure to provide Plaintiffs the entire maintenance and cure they are due has been willful, arbitrary, capricious, in violation of the law, and/or in callous disregard for Plaintiffs' right as seamen. As such, Plaintiffs would be entitled to recover their attorneys' fees from Defendant under the General Maritime Law of the United States and potentially punitive damages.

61.     At all times material hereto, Defendant's unreasonable and/or callous failure to pay or provide Plaintiffs with maintenance and cure aggravated Plaintiffs' conditions and caused them to suffer additional compensatory damages, including, but not limited to, the aggravation of their physical condition, disability, pain and suffering, reasonable fear of developing future physical and medical problems, mental anguish, loss of enjoyment of life, feelings of economic insecurity as well as lost earnings or earning capacity, and medical and hospital expenses in the past and into the future.

        **WHEREFORE,** Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant and demand trial by jury.

## COUNT IV – FAILURE TO PROVIDE PROMPT, PROPER AND ADEQUATE MEDICAL CARE

        Plaintiffs re-allege, incorporate by reference, and adopt paragraphs one (1) through forty-five (45) above as though originally alleged herein.

62.     At all times material hereto, Defendant had an absolute and non-delegable duty to provide Plaintiffs with prompt, proper, and adequate medical care.

63.     At all times material hereto, Defendant, through its employees, agents, the shipboard and/or shoreside physicians and/or nurses, negligently failed to provide Plaintiffs with prompt, proper, and adequate medical care. Defendant's acts and/or omissions, as outlined below, caused,

contributed and/or played a substantial part in bringing about Plaintiffs' injuries and damages.

Defendant's negligent acts/omissions include, but were limited to:

    a.  Failure to promptly, properly, and adequately diagnose and/or treat Plaintiffs' COVID-19 diagnoses once Defendant became aware of their symptoms and/or diagnoses;

    b.  Failure to select, retain and/or utilize competent, skilled and properly trained medical care providers on board the vessel and shoreside to provide Plaintiffs with prompt, proper and adequate medical care;

    c.  Failure to utilize proper and adequate medical equipment with which to provide Plaintiffs proper and adequate medical care;

    d.  Failure to properly medically manage Plaintiffs' COVID-19 diagnoses once Defendant became aware of their symptoms and/or diagnoses;

    e.  Failure to timely disembark Plaintiffs to provide them prompt, proper, and adequate medical treatment ashore without delay;

    f.  Defendant's failure to reimburse and/or failure to timely reimburse Plaintiffs for their out-of-pocket medical expenses;

    g.  Defendant failure to authorize and/or failure to provide Plaintiffs with prompt shoreside medical care; and/or

    h.  Defendant prematurely terminating Plaintiffs' medical care before they achieved MMI and/or MMC.

64.    The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated aboard Defendants' vessels to contract COVID-19 and/or other virus and/or medical complications, sustain personal injuries and/or death.

65.    At all times material hereto, Defendant knew or should have known of the foregoing conditions which caused and/or resulted in Plaintiffs' injuries and/or death and did not correct them. In the alternative, the foregoing conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care should have learned of them and corrected them.

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

66.     As a direct and proximate result of Defendant's acts and/or omissions, as outlined above, Plaintiffs suffered additional pain, disability and/or their recovery was prolonged. In addition, Plaintiffs became more susceptible and/or vulnerable to other illness and/or medical conditions, including pre-existing illness and/or medical conditions, and were injured about their bodies and/or extremities. Plaintiffs also suffered physical pain and suffering, mental anguish, reduced lung function and/or capacity, future physical and medical problems (including but not limited to reduced lung function and/or capacity) and/or the reasonable fear of developing future physical and medical problems. Plaintiffs also lost enjoyment of life, and suffered physical and/or functional disability, physical and/or functional impairment. Plaintiffs were also inconvenienced in the normal pursuits and pleasures of life and suffered from feelings of economic insecurity caused by disability, disfigurement. Plaintiffs also suffered aggravation of any previously existing conditions as a result of contracting COVID-19, incurred medical expenses in the care and treatment of their injuries, suffered physical handicap, lost wages, income lost in the past, and their working abilities and/or earning capacities have been impaired. Additionally, some Plaintiffs have or will die. The Plaintiffs that do not die immediately will experience a reduced life expectancy. Plaintiffs injuries and damages are permanent or continuing in nature, and they will suffer these losses and impairments in the future.

67.     This Count is alleged separately from Jones Act negligence asserted above pursuant to *Joyce v. Atlantic Richfield Company*, 651 F. 2d 676 (10th Cir. 1981), which states, in part, "Negligent failure to provide prompt medical attention to a seriously injured seaman gives rise to a separate claim for relief [for which separate damages are awardable]."

**WHEREFORE,** Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant and demand trial by jury.

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

Dated: April 14, 2020

Respectfully submitted,

LIPCON, MARGULIES,
ALSINA & WINKLEMAN, P.A.
*Attorneys for Plaintiffs*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone No.: (305) 373-3016
Facsimile No.: (305) 373-6204

By:  *Michael Winkleman*

**JASON R. MARGULIES**
Florida Bar No. 57916
jmargulies@lipcon.com
**MICHAEL A. WINKLEMAN**
Florida Bar No. 36719
mwinkleman@lipcon.com
**JACQUELINE GARCELL**
Florida Bar No. 104358
jgarcell@lipcon.com
**L. ALEX PEREZ**
Florida Bar No. 125452
aperez@lipcon.com